FILED

Oct 17 2019, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Amy Karozos | Karen R. Swopes |
| Greenwood, Indiana | Terre Haute, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Adoption of D. H., K.W., | October 17, 2019 |
| *Appellant-Respondent,* | Court of Appeals Case No. 19A-AD-707 |
| v. | Appeal from the Greene Circuit Court |
| B.H., | The Honorable Erik Allen, Judge |
| *Appellee-Petitioner.* | Trial Court Cause No. 28C01-1804-AD-9 |

**Tavitas, Judge.**

## Case Summary

[1]      K.W. appeals the entry of a decree of adoption in favor of B.H. ("Stepmother"), upon a finding that K.W.'s consent was not required for Stepmother's petition to adopt K.W.'s minor child, D.H. (the "Child). We reverse and remand.

# Issue

K.W. raises three issues on appeal; however, we address only the following dispositive question: whether the trial court's finding that K.W.'s consent was not required for Stepmother's adoption of the Child is clearly erroneous.

# Facts

K.W. and J.H. ("Father") are the biological parents of the Child, who was born in April 2015.[1] K.W. and Father never married, but they lived together for over one year in Greene County, Indiana. At birth, the Child's meconium tested positive for hydrocodone, and K.W. tested positive for opiates and benzodiazepines. On May 7, 2015, the Greene County Office of the Department of Family and Children ("DCS") entered an informal adjustment[2] and assessed K.W. for substance abuse.[3] On July 22, 2015, DCS filed a petition alleging that the Child was a child in need of services ("CHINS") due to K.W.'s noncompliance with the informal adjustment. During the pendency of the

---

[1] In addition to the Child, K.W. has three older children who live with her ex-husband, C.B. The three older children tested positive for opiates and/or narcotics at birth. K.W. has another child, born November 20, 2016, who resides with K.W. and her boyfriend.

[2] An informal adjustment is a voluntary program wherein the family of the child(ren) at issue must "maintain communication with DCS and show that [the family is] willing to work services." Tr. Vol. I p. 24.

[3] K.W. advised her DCS caseworker that hydrocodone and Xanax were prescribed to her during her pregnancy. Although K.W. was, in fact, prescribed both medications, DCS later determined that one prescription was written before K.W. was pregnant, and the other prescription was not written with knowledge of K.W.'s pregnancy.

CHINS action, K.W. tested "positive for various substances, including THC, Tramadol, and Hydrocodone." Appellant's App. Vol. I p. 16.

[4]     K.W. and Father lived together until September 2015, when K.W. moved out and left the Child with Father following a domestic violence incident. On two occasions in October 2015, K.W. asked Father to bring the Child to visit K.W. at work and at her sister's home, and Father obliged. In the parties' ensuing paternity action, "the parties were granted joint legal custody and the father was awarded primary physical custody, and [K.W.] had parenting time pursuant to the guidelines with the requirement that her parenting time be supervised [by the Child's maternal grandfather]." *Id.* at 17.

[5]     Father and Stepmother began dating in November 2015.[4] On December 16, 2015, the trial court approved Father's and K.W.'s joint stipulated order ("Agreement") regarding custody and parenting time,[5] which provided:

> [K.W.] would pick up the child to begin her parenting time and the father would pick up the child at the end of [K.W.]'s parenting time, that a review hearing would be conducted to address child support, and whether any adjustment was appropriate to [K.W.]'s parenting time.

*Id.* K.W.'s visits were ordered supervised by maternal grandfather; however, paternal grandmother began supervising the visits due to concerns about

---

[4] Stepmother moved into Father's residence in mid-March 2016; they married in March 2018.

[5] DCS subsequently dismissed the CHINS action.

maternal grandfather's alcohol consumption. The issue of child support was to be addressed during a subsequent review hearing, but K.W. did not appear; accordingly, no child support order was entered.

[6]     In December 2015, K.W. moved approximately ninety miles away to Johnson County, Indiana. After K.W. moved, her contact with the Child was sporadic and inconsistent.[6] K.W. participated in a supervised visit with the Child on

---

[6] K.W.'s contacts with the Child, before the filing of the notice of adoption, were as follows:

- February 2016 – K.W. visited with the Child but arrived late.

- April 2016 – Father invites K.W. to the Child's birthday party. K.W. testified that she was present; Father and paternal grandmother testified that K.W. did not attend.

- June 2016 – K.W. and the Child had a supervised park visit.

- September 11, 2016 – K.W. and the Child had a supervised park visit.

- September 15, 2016 – No call, no show by K.W.

- June 23, 2017 – K.W. sends a text to Father to supply her new phone number. Ex. Vol. p. 79.

- June 25, 2017 – K.W. sends a text to Father stating, "Tell [the Child] mom loves her, misses her, and goodnight please." *Id.*

- July 4, 2017 – K.W. sends a text to Father asking, "Did [the Child] have a good 4th of July?" *Id.*

- July 12, 2017 – K.W. sends a text to Father stating, "tell [the Child] I love her and good night." *Id.* at 80.

- February 3, 2018 – K.W. and the Child engaged in a supervised visit at paternal grandmother's home. The Child did not recognize K.W.

- February 25 and 26, 2018 – K.W. sends texts requesting visits with Child. Father responds, "This weekend is no good[.]" *Id.* at 92.

- March 14, 2018 – K.W. sends text to Father asking for a weekend visit. Father agrees, but K.W. cancels, citing car trouble.

- March 18, 2018 – K.W. cancelled the scheduled visit.

September 11, 2016, and did not again visit with the Child until February 3, 2018. During this period, K.W. appears to have worked to achieve sobriety. The record reveals that K.W. passed drug screens to secure employment; maintained gainful employment; secured stable housing; and obtained means of transportation. Thereafter, K.W. resumed her requests to schedule supervised visits with the Child. *See* footnote 6.

[7] On April 2, 2018, Stepmother filed a petition to adopt the Child and alleged that K.W.'s consent to the adoption was not required: (1) "pursuant to IC 31-19-9-8(a)(2) because [K.W. had] not financially supported the child in any way since . . . [K.W.] separated from [Father]"; (2) pursuant to IC 31-19-9-8(a)(2) because [K.W.] [ ] had only one contact with the child since September 11, 2016"; and (3) "pursuant to IC 31-19-9-8(a)(1) and IC 31-19-9-8(b) because [K.W.] [ ] abandoned or deserted the child for at least six (6) months immediately preceding the date of the filing of [the adoption] petition." *Id*. at. 29. Stepmother further alleged that K.W. was "unfit" to parent the Child and that "the best interest of the child would be served if the Court dispensed with [K.W.]'s consent[.]" *Id*.

---

- March 28, 2018 – K.W. sends a text to Father asking for a weekend visit. Father responds that the family has other plans.

- April 1, 2018 – K.W. sends a text to Father asking to schedule a visit. Father responds, "I'll let y[ou] know." *Id*. at 109.

- April 2, 2018 – Stepmother files petition to adopt the Child.

[8]     On April 12, 2018, K.W. filed an objection to the petition for adoption wherein she alleged that her efforts to achieve sobriety provided justifiable cause for her failure to maintain significant contact with the Child. *Id*. at. 34. The trial court conducted a hearing on the issue of the necessity of K.W.'s consent on September 10 and October 17, 2018.

[9]     At the hearing, K.W. testified to the foregoing facts. Father testified that "[K.W.] has never ever called my phone ever, the only thing [he] ever received from [K.W.] is text messages telling [him] to tell [the Child] that [K.W.] loved [the Child] . . . ." Tr. Vol. II p. 85. Father testified further that K.W. has "[n]ever" telephoned the Child. *Id*. Father and Stepmother testified that the Child is closely-bonded with Stepmother, regards Stepmother as her "mom," and lacks a comparable bond with K.W. *Id*. at 59. Father also testified that he denied K.W. parenting time after the April 2018 filing of the adoption petition.

[10]    The trial court issued findings of fact and conclusions of law on February 1, 2019, and found that K.W.: (1) provided no meaningful support for the child from 2016 through the filing of the petition for adoption on April 2, 2018; (2) "abandoned or deserted" the Child; and (3) lacked justifiable cause for her lack of communication with the Child. *Id.* at 20-21. The trial court, thus, concluded that K.W.'s consent was not required for Stepmother's adoption of the Child. The decree of adoption was entered on March 12, 2019. K.W. now appeals.

# Analysis

[11] K.W. challenges the trial court's finding that her consent was not required for Stepmother's adoption of the Child. In her brief, K.W. argues:

> [K.W.] agreed to relinquish physical custody. . . at a time when [K.W.] was addicted to opiates. The agreement [provided] that K.W. would not pay support and included [ ] supervised visitation. K.W. struggled and succeeded in getting her life back together, and when she had been drug free for two years, and had a full-time job, she asked for regular visits. It was only at this point, that Father and [Stepmother] filed a Petition for Adoption alleging K.W. had abandoned the[ ] child and that her consent was not needed for the adoption.

K.W.'s Br. p. 16.

[12] When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. We generally give considerable deference to the trial court's decision in family law matters, because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children. We will not disturb the trial court's ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. The trial court's findings and judgment will be set aside only if they are clearly erroneous. A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. We will neither reweigh the evidence nor assess the credibility of witnesses, and we will examine only the evidence most favorable to the trial court's decision.

*In re Adoption of O.R.*, 16 N.E.3d 965, 972-73 (Ind. 2014) (citations and quotations omitted). When the trial court makes findings of fact and conclusions of law, we apply a two-tiered standard of review: "we [ ] first determine whether the evidence supports the findings and second, whether the findings support the judgment." *In re T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). Factual findings "are clearly erroneous if the record lacks any evidence or reasonable inferences to support them [and] . . . a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." *Id.* (internal quotation omitted).

[13] The purpose of our adoption statutes is to protect and promote the welfare of children by providing them with stable family units. *In re Adoption of K.F.,* 935 N.E.2d 282, 289 (Ind. Ct. App. 2010), *trans denied*. The relationship between parent and child is of such fundamental importance that adoption statutes, being in derogation of the common law, are "strictly construed in favor of a worthy parent and the preservation of such relationship." *Id.* In evaluating the parent-child relationship, however, the best interest of the child is paramount, and "our main concern should lie with the effect of the adoption on the reality of the minor child's life." *Id.*

[14] As to biological parents, we have opined that "[t]he most protected status in any adoption proceeding is that of the natural parent. Recognizing the fundamental importance of the parent-child relationship, our courts have strictly construed the adoption statute to preserve that relationship." *In re*

*Adoption of N.W.*, 933 N.E.2d 909, 913 (Ind. Ct. App. 2010) (citation omitted), *adopted by* 941 N.E.2d 1042 (Ind. 2011).

[15]   Generally, a parent's consent to adoption of a child under the age of eighteen is required.  Ind. Code § 31-19-9-1.  Indiana Code Section 31-19-9-8 enumerates circumstances under which a trial court may dispense with the consent of an absent parent in order to grant a potential adoptive parent's petition to adopt. Our Supreme Court has stated that "the statute's design tries to limit an absent parent's ability to thwart potential adoptive parents' efforts to provide a settled environment[,]" where that absent parent has previously "purposefully sought to abandon her child." *In re Adoption of E.B.F. v. D.F.*, 93 N.E.3d 759, 767 (Ind. 2018).

[16]   Pursuant to Indiana Code Section 31-19-9-8(a), consent to adoption is not required, *inter alia*, from:

> (1) A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.
>
> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
>>
>> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

I.C. § 31-19-9-8 (emphasis added).  Indiana Code Section 31-19-9-8(b) further provides that "[i]f a parent has made only token efforts to support or to communicate with the child[,] the court may declare the child abandoned . . . ."

[17]  The consent analysis in this case pertained to a drug-addicted, absentee parent. We cannot overstate the ravaging effects of drug addiction on families and children in Indiana.  As our Supreme Court has stated, "[T]he destructive tentacles of the substance abuse epidemic continue to reach every corner of our State, [and] Hoosier parents ravaged by addiction—particularly victims of opioid dependency—face difficult decisions to safeguard their children's welfare."  *E.B.F.,* 93 N.E.3d at 760.  Drug-addicted parents confront a double-edged sword—they can either: (1) retain custody of their child(ren) and, thereby, risk exposing the child(ren) to unsafe and unstable environments, inadequate supervision, and conditions in which the child(ren)'s basic needs may not be met; or (2) relinquish custody in concern for the child(ren)'s well-being and, thereby, risk the possibility of being deemed an absent parent who has abandoned the child(ren).

[18]  In *E.B.F.,* our Supreme Court seized a timely "opportunity to do the right thing as to th[e] particular mother and child [at issue in that case], while also providing [ ] additional instruction on justifiable cause."  *Id*. at 764.  The mother in *E.B.F.*, who was battling addiction and domestic violence at the father's hand, agreed to relinquish primary physical custody of the child to the

father. *Id.* at 761. The mother retained joint legal custody with supervised visits, and no child support obligation was imposed due to her indigency. Subsequently, for a period exceeding one year, the mother failed to make significant contacts with the child as she worked toward sobriety. The child's stepmother then filed a petition for adoption, which the trial court granted upon a finding that the mother's consent was not necessary for the grant of the adoption petition.

[19] In reversing the trial court, our Supreme Court found:

> Although Mother failed to have significant communication with [the child] for a period of more than one year, her willingness to shield her son from the adverse effects of her addiction, coupled with her good-faith attempt at recovery and noticeable progress, constitute justifiable cause for her failure to communicate.[7]

*Id.* at 763. Our Supreme Court acknowledged that the mother's contact with the child was "not significant" after Christmas 2013 and the stepmother's August 2015 filing of her adoption petition, but found that "a single significant communication within one year is sufficient to preserve a non-custodial parent's right to consent to the adoption." *Id.* at 763.

---

[7] The *E.B.F.* Court also found that the father and stepmother "thwarted whatever occasional attempts Mother made to communicate with Child, in violation of the agreed-upon custody modification order, thus further impeding Mother's ability to communicate with Child." *Id.*

Additionally, the *E.B.F.* Court considered whether, "despite [the mother's] failure to communicate significantly with [the child] during a one-year period, the mother had justifiable cause to forgo communication" and concluded that justifiable cause existed under the unique facts and circumstances of the case. *Id*. at 764. As evidence of justifiable cause, the Supreme Court first cited the mother's voluntary relinquishment of custody "after recognizing the harm that her personal problems were having on her son." *Id*. at 765 ("We take into account that Mother wanted the best for her child and *nothing in the record indicates she intended to abandon him*. If she gave up custody, it was only because she understood that, given her circumstances, continued custody and even regular contact would be damaging to Child's welfare."). The *E.B.F.* Court further cited the mother's "good-faith effort at recovery during the period that she failed to communicate with Child" and stated:

> . . . Mother not only focused on her recovery during that period, she also made significant strides to end the destructive habits that led her to give up custody . . . . [M]other ended her abusive relationship, found a job, and secured adequate housing . . . . By the end of 2014, she had also ended her dependency on drugs and had a good and stable home life. Mother turned her life around in what we find was a reasonable amount of time—less than one year. Before the one-year anniversary of the custody modification, Mother seemed on the cusp of being ready to, once again, be a significant part of [the child's] life, but that possibility was cut short when Stepmother's adoption petition was granted. We are sensitive to Mother's predicament: returning to [the child's] life too early during her addiction recovery process could have derailed both her own recovery and the child's stability. We, therefore, do not fault Mother for taking a reasonable amount of time to focus on her recovery, even if that effort

resulted in a temporary failure to communicate significantly with her child.

Because being around a child while recovering from drug dependency and an abusive relationship may not be in the best interest of either the child or the recovering mother, and because Mother demonstrated that she made a good-faith effort at recovery, with significant progress within a reasonable amount of time, we find that Mother had justifiable cause to not communicate with [the child] during that one-year period.

*Id*. at 765. We find that such is the case here.

[21] The trial court found, on three bases, that K.W.'s consent was not required for Stepmother's adoption of the Child. We address *E.B.F.*'s applicability to each of these bases.

### *I. Abandonment*

[22] First, the trial court found that K.W.'s consent was unnecessary for Stepmother's adoption of the Child because K.W. abandoned or deserted the Child. Pursuant to Indiana Code Section 31-19-9-8(a), consent to adoption is not required from "[a] parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption." I.C. § 31-19-9-8(a)(1).

[23] With respect to abandonment, the trial court's pertinent findings are as follows:

25. Pursuant to I.C. 31-19-9-8(a)(1), consent to adoption is not required from a parent or parents if the child is adjudged to have been abandoned or deserted for at least 6 months immediately

preceding the date of filing the petition for adoption. Further, pursuant to I.C. 31-19-9-8(b), if a parent has made only token efforts to support the child the Court may declare the child abandoned by the parent. The petition for adoption was filed on April 2, 2018. In the 6 months preceding the filing of the petition for adoption, [K.W.] sent the father a text on January 23, 2018 and asked if the father needed anything for the child and he declined, and on [K.W.]'s only visit on February 3, 2018 (only visit since [K.W.] visited the child on September 11, 2016), she brought the child a small stuffed toy. [K.W.] was late to this visit and the child did not know who she was, and the child elected to call her [K.] instead of mom. On March 17, 2018, [K.W.] cancelled her visit scheduled for March 18, 2018. [K.W.] only had one visit with the child and did not actually provide any meaningful support for the child for the 6 months immediately preceding the filing of the petition; therefore, the Court concludes that [K.W.] abandoned or deserted the child.

Appellant's App. Vol. II p. 20.

[24] The record reveals the following: first, K.W. testified that she never intended to abandon the Child, and the circumstances of K.W.'s breakup with Father tend to support K.W.'s claim that she did not intend to abandon the Child. K.W. testified that she left Father after Father "picked up [the Child']s formula can and threw it at [K.W.'s] head full force and busted [K.W.'s] head open" in an argument over K.W.'s drug abuse. Tr. Vol. II p. 166. K.W. testified that she attempted to take the Child with her when she left Father; and, that when Father prevented her from doing so, she enlisted assistance from the police, who declined to intervene.

Further, K.W.'s visitation record with the Child, though admittedly sparse, indicates that she did not intend to abandon the Child. The record reveals that, after K.W. left Father in September 2015, Father brought the Child—at K.W.'s request—to visit K.W. on two occasions in October 2015. In the same vein, K.W.'s text messages to Father, in which K.W. stated she missed the Child and asked Father to tell the Child that K.W. loved the Child, indicate K.W.'s intention to maintain a connection with the child. Based on *E.B.F.*, we conclude that the trial court's finding that K.W. abandoned or deserted the Child is clearly erroneous.

## II. Failure to Communicate

Next, the trial court found that K.W.'s consent was unnecessary for Stepmother's adoption of the Child because of K.W.'s failure to communicate significantly with the Child. Indiana Code Section 31-19-9-8(a) provides that consent to adoption is not required from: "A parent of a child in the custody of another person if for a period of at least one (1) year the parent . . . fails without justifiable cause to communicate significantly with the child when able to do so . . . ." I.C. § 31-19-9-8(a)(2)(A).

The trial court's pertinent findings were as follows:

> 26. Pursuant to I.C. 31-19-9-8(a)(2)(A), consent to adoption is not required from a parent of a child in the custody of another person if, for a period of at least one year, the parent fails without justifiable cause to communicate significantly with the child when able to do so. After the mother's visit on September 11, 2016, the mother did not call, video chat, or in any way directly

communicate with the child until she next visited on February 3, 2018, and there is no credible evidence that the mother made any effort to communicate with the child that was thwarted by the father or anyone else. The mother did not send the father any texts or otherwise communicate with him in any way between October 2016 and June 2017. The mother sent a few texts to the father in June and July 2017, but then did not again communicate with him until December 2017. These messages to the father were not significant communications and were not communications with the child. The evidence is clear that the mother did not have any communication with the child between September 11, 2016 and February 3, 2018, and did not have significant communication with the child from the lone visit on February 3, 2018 through the date the petition for adoption was filed.

The Court concludes the mother's lack of communication with the child was without justifiable cause. The mother in part claims a lack of transportation and, although this may have merit for a relatively short period of time, this claim does not have merit based upon the distance between the mother's community of residence and the child's community of residence, and the period of time that the mother had no communication of any nature with the child. The mother elected to move approximately 75 miles from the child and to remain in that location. Further, the evidence shows that the mother did not communicate to the father that transportation was an issue until December 2017.

The mother's claim of rehab being a basis for not communicating with the child is also without merit. In addition to this being contrary to the statements in the mother's text messages to the father prior to the filing of the petition for adoption, the mother only attended five meetings between December 23, 2015 and January 19, 2016, and the mother was discharged from rehab for non-compliance. The mother continued to have some visits with

the child after she was discharged from rehab in 2016 until her last visit on September 11, 2016.

The mother also claims that the father thwarted her efforts to communicate with the child. At the most basic level, there is no evidence that the mother made any significant effort to communicate with the father or the child between September 11, 2016 and February 3, 2018, therefore, the father cannot thwart an effort that is not made. Further, the mother's few communications to the father indicate it is her circumstances and life choices that caused her to not communicate, and acknowledged in a text in December 2017 that ". . . I did not say it was your fault." The father's text responses in December 2017 or January 2018, indicate his willingness to allow the mother to visit and communicate with the child if she will follow through, and his frustration with her failure to communicate with the child for an extended time. The father's willingness to allow the mother to visit with the child is corroborated by the mother having a visit on February 3, 2018, and scheduling another visit on March 18, 2018, which the mother cancelled the day prior to the scheduled visit. The Court finds no merit or credibility to any of the mother's claims of justifiable cause for not communicating with the child.

Appellant's App. Vol. II p. 21.

[28]     We find that the instant case is factually akin to *E.B.F.* with respect to the acuteness of K.W.'s addiction, K.W.'s reasons for moving away, and the resulting justifiable cause analysis. Regarding her reasons for moving nearly

two hours away from the Child, K.W. testified that she was acutely[8] addicted to narcotics and opiates from 2008 to 2015, after becoming dependent on medications initially prescribed by a dentist. K.W. testified that "[she] left town to get [her] life together"—namely, to get sober; for distance from family members who were abusing drugs and alcohol; to secure employment and stable housing; and to mend her finances. *Id.* at 123.

[29] When counsel for Father asked K.W. why she failed to consistently visit and engage with the Child, K.W. testified, "[her] drug problem was not the only aspect of [her] life that was bad"; "[i]t takes much more than [drug] rehab[ilitation] to overcome a drug problem . . . it is something that takes time"; "[d]rug wise yes, [she] was okay [and] knew that [she] was never going to use again, but in other areas of [her] life financially especially [she] was not in a good position." *Id.* at 147. The following colloquy ensued:

> Q:      . . . [I]f you don't show up, if you don't have contact with [the Child] or your contacts are so sporadic, do you understand that affects [the Child]?
>
> A:      . . .[I]t affects the child to have an unstable mother in their life, someone that was addicted to drugs and that was not financially stable, had no vehicle,[9]that is not good for a child.

---

[8] K.W. testified that she routinely lied about her drug use. Father testified that K.W. "stole" prescription medications from him and hid and locked herself in rooms to crush and "snort[ ] pills." Tr. Vol. II pp. 231, 234.

[9] K.W. also testified that she was without transportation from September 2016 to December 2017.

*Id.* at 157.  K.W. testified further, "I wanted to be in a good place like I am today before I attempted to be in her life."  *Id.* at 153.

[30]  First, here—as in *E.B.F.*—although K.W.'s contacts with the Child were inconsistent and sporadic prior to the April 2018 filing of the adoption petition, we find that the February 13, 2018 visit, coupled with K.W.'s other contacts,[10] suffices for purposes of preserving K.W.'s right to consent to the adoption.  As the *E.B.F.* Court found:

> A determination on the significance of the communication is not one that can be mathematically calculated to precision.  Our Court of Appeals was correct in stating that significance of the communication cannot be measured in terms of units per visit.  Even multiple and relatively consistent contacts may not be found significant in context.  But a single significant communication within one year is sufficient to preserve a non-custodial parent's right to consent to the adoption.

93 N.E.3d at 763.

[31]  Next, we find that, based on *E.B.F.*, K.W.'s efforts to achieve sobriety supply justifiable cause for her failure to maintain significant contact for over one year. The record reveals that, at the time of the evidentiary hearing, K.W. testified that her addiction issue was "under control" and she had "gotten [her] life together[;] that is what has changed."  *Id.* at 142, 171.  K.W. testified that "[she] ha[d] been clean for almost three years"; that "[she] was drug tested a couple of

___

[10] *See* footnote 6.

weeks" before the evidentiary hearing amid court proceedings relating to her three oldest children; and that she "would always, always be willing to take any drug test." *Id*. at 152, 153.

[32] K.W. testified further that she: (1) is gainfully employed with a perfect attendance work history spanning two and one-half years, has passed periodic drug screens at work, and earned workplace accolades; (2) has begun to establish a consistent record of visitation with her three oldest children, as corroborated by her ex-husband C.B.'s testimony, pays court-ordered child support and health insurance and has progressed from supervised visits to partially-unsupervised visits with the three oldest children; (3) has secured reliable means of transportation; (4) has not been arrested or convicted of a criminal offense; and (5) successfully passed a DCS home inspection and drug test following the birth of her youngest child (born on November 20, 2016).

[33] Guided by *E.B.F.*, we find, under the totality of the circumstances that K.W.'s: (1) progress toward achieving sobriety after seven years of acute drug dependency; (2) employment record; (3) stable home environment; (4) lack of contacts with law enforcement; (5) favorable assessment from DCS regarding her youngest child; and (6) record of consistently visiting and paying child support for her other three children, provide justifiable cause for her failure to communicate with the Child for a time exceeding one year, such that it was clear error to dispense with her consent for purposes of Stepmother's adoption petition.

### III. Failure to Support

[34] Lastly, the trial court found that K.W.'s consent was not necessary for Stepmother's adoption of the Child because K.W. failed to support the Child. Indiana Code Section 31-19-9-8(a) provides that consent to adoption is not required from "[a] parent of a child in the custody of another person if for a period of at least one (1) year the parent . . . knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree." I.C. § 31-19-9-8(a)(2)(B).

[35] The trial court's pertinent findings are as follows:

> 24. Pursuant to I.C. 31-19-9-8(a)(2)(B), consent to adoption is not required from a parent of a child in custody of another person if, for a period of at least one year, the parent knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree. Every parent has a legal duty to support their child. The lack of a Court order to pay support did not relieve the mother from her obligation to provide support for the child when she had the ability to do so. The evidence is clear that the mother's income, along with the contribution to household expenses from her significant other, was sufficient to provide some meaningful support for the child during 2016, 2017, and 2018. The mother provided no meaningful support for the child from 2016 through the date the petition for adoption was filed on April 2, 2018, and beyond.

Appellant's App. Vol. II p. 20. Here, K.W. testified, and Father confirmed in his testimony, not only that no child support order was in effect, but also that K.W. offered financial assistance that was refused by Father. *See* Tr. Vol. II p. 117. We disagree with the trial court that K.W.'s failure to provide support for

the Child justifies dispensing with her consent for purposes of Stepmother's adoption petition. Based on *E.B.F.*, this finding is clearly erroneous.

## *IV. Summary*

[36] Further, we note that we would be hard-pressed, in the context of a proceeding for termination of parental rights, to proceed to termination of K.W.'s parental rights here, given the progress she displayed regarding the conditions that led to the Child's removal from her care.[11]

[37] To be clear, this opinion does not foreclose the possibility of Stepmother's adoption of the Child in the future, but the statutes dispensing with K.W.'s consent do not apply at this time. Father and Stepmother remain the pillars in the Child's life, having supplied day-to-day care, support, and guidance in the Child's formative years when K.W. was absent. To echo the *E.B.F.* Court:

> With today's decision, Child remains where he should be: in Father's custody. Father and Stepmother's tremendous work rehabilitating a child who undoubtedly suffered the impact of his mother's addiction does not go unnoticed. * * * * * Father and Stepmother took excellent care of Child's needs when he needed it most and will continue to be an integral and necessary part of Child's life, providing care in the foreseeable future.

---

[11] As discussed above, K.W. demonstrated progress on the various fronts: (1) achieving sobriety after seven years of acute drug dependency; (2) maintaining a record of consistent employment; (3) establishing a stable home environment; (4) lacking contacts with law enforcement; (5) obtaining a favorable assessment from DCS regarding her youngest child; and (6) visiting and paying child support for her other three children consistently.

*E.B.F.*, 93 N.E.3d at 767. As in *E.B.F.*, we intervene here "merely [to] preserve [K.W.]'s opportunity to reestablish her relationship" with the Child. *Id.* We commend Father for stating, at the evidentiary hearing that, if Stepmother's adoption was not granted, he would "never" bar K.W. from exercising her parenting time with the Child. S*ee* Tr. Vol. III p. 3. We believe this to be in the best interest of the Child. *See E.B.F.*, 93 N.E.3d at 767 (finding, under the totality of the circumstances, that "we are certain [it] is in the best interest of both child and the recovering mother" to allow the mother an opportunity to reestablish her relationship with the child).

[38] Under the unique facts and circumstances of this case, we reverse the trial court's finding that K.W.'s consent is not required for Stepmother's adoption of the Child. We remand with instructions to vacate the entry of the adoption decree.[12]

## Conclusion

[39] Based upon *E.B.F.*, K.W.'s consent was necessary to grant Stepmother's adoption petition. We reverse the trial court's consent determination and entry of the adoption decree. We reverse and remand with instructions.

[40] Reversed and remanded.

---

[12] In light of our reversal of the trial court's consent determination, we do not reach the merits of K.W.'s claims that she was denied due process and that adoption is not in the Child's best interests.

Brown, J., and Altice, J., concur.